Guggenheimer & Untermeyer, (Samuel Untermeyer, of counsel,) for respondent.

PER CURIAM. For the reasons set forth in the opinion of the court below, (18 N. Y. Supp. 719,) the judgment and order appealed from are affirmed, with costs.

---

### TALLMADGE et al. v. LOUNSBURY, Treasurer.

(Superior Court of New York City, General Term. January 3, 1893.)

1. PRINCIPAL AND AGENT—APPOINTMENT.
    The mere fact that several members of the campaign committee of the Republican National League expressed an opinion that certain blanks ought to be printed, confers no authority on the person suggesting the scheme to bind the league by ordering the printing to be done.
2. SAME—RELIANCE ON AGENT'S AUTHORITY.
    The Republican National League is not liable for the printing of campaign literature on the ground that it had clothed its president with full authority to make any and all contracts in its behalf, where it appears that such printing was not done in reliance on an order from the president, but on an order given by the representative of the treasurer of the national committee.
3. ASSUMPSIT—WORK AND LABOR—ACCEPTANCE OF BENEFITS.
    The mere fact that certain campaign literature had at its head the name and symbol of the Republican National League, and that such literature was received at and mailed from its headquarters, does not render it liable for the printing, where it appears that the function of the league was merely to distribute literature furnished it by the national committee; that none of the committees vested with the management of the league's affairs had ordered such literature to be printed; and that none of the members of such committees, with the exception of two, knew of the performance of the work.
4. SAME.
    The fact that campaign literature, printed by plaintiffs, and used by the National Republican League, brought a large sum of money into the hands of its president, does not render the league liable for the printing, where it appears that a larger sum than that received from this source was actually paid plaintiffs by the league.
5. PRINCIPAL AND AGENT—RATIFICATION.
    The unauthorized acts of the agent of the National Republican League in ordering the printing of campaign literature cannot be considered as having been ratified by it, where it does not appear that the claim for the work was ever presented to the league convention, or to its executive or subexecutive committees, or that the delegates to the convention or the members of the committees knew of the existence of such claim.

Appeal from judgment on report of referee.

Action by Daniel W. Tallmadge and George G. Martin against Phineas C. Lounsbury, as treasurer of the Republican League of the United States, for furnishing and distributing campaign literature and political printing. From a judgment dismissing the complaint, plaintiffs appeal. Affirmed.

The cause was referred to Louis C. Raegener, Esq., who, on October 29, 1890, filed the following memorandum of decision:

"The plaintiffs, constituting the firm of Tallmadge & Martin, printers and stationers, at the city of New York, claim that during the presidential campaign of 1888 they let certain premises at No. 64 Broad street, and that they furnished and distributed what has been termed herein 'campaign literature' and political printing of the value of nearly $25,000 to the defendant, the Republican League

of the United States.   All but $11,484.80, which is the amount here in suit, has been paid.   The plaintiffs seek to maintain their claim upon several theories, the more important of which are:   First, express authority received from the defendant, through its campaign committee; secondly, the conduct of the president of the defendant, who, in his position, it is claimed, was allowed to hold himself out to the world as one in authority, and who, in such position, if not directly ordering the work, at least stood by without protest, and with knowledge of the fact that plaintiffs claimed they were doing this work for defendant; and, thirdly, ratification by the defendant of the acts of its campaign committee and president. We shall discuss these points in their order; and as, in our opinion, the issues involved are entirely questions of fact, it will not be necessary to discuss the law of the case.

"In order to intelligently understand the situation of affairs, it is necessary briefly to show the organization of defendant.   The Republican clubs in each state belong to a state league.   The state leagues compose the defendant, the Republican National League.   The several state leagues send representatives to an annual convention of the national league, and elect an executive committee, which is intrusted with the finances and general management of the affairs of the national league.   In a general way, the objects of the national league are stated to be the organization of clubs and leagues in the various states and territories, and the dissemination of the principles of the Republican party.   At a conference committee, held on July 11 and 12, 1888, it was deemed advisable that the executive committee appoint a campaign committee, and this was accordingly done, upon the following understanding or agreement with the Republican National Committee.   The national committee was to prepare and provide campaign literature, which the league was to distribute.   The national committee guarantied office expenses of the league to the extent of $1,000 per month.   The campaign committee, from time to time, was to submit plans of organization and work, with the estimated cost thereof, and, if approved, the expense was to be paid by the Republican National Committee.   This campaign committee was accordingly appointed.   It consisted of Gen. W. W. Dudley, Wilbur A. Mott, W. W. Johnson, and President James P. Foster, and Secretary Andrew Humphrey, as ex officio members.   Gen. Dudley was its chairman.   He was also the treasurer of the national committee, but not a member of the league.   This committee met but once,—in the latter part of July, 1888.   No minutes of its proceedings were kept. No resolutions were adopted, except it was agreed to meet on Wednesdays.   After the formal meeting had adjourned, Ex-senator Albert Daggett, who claims to have attended more or less to the details of political campaigns for about thirty years, showed some blanks and forms to some of the members, and an informal discussion took place concerning them.   Mr. Daggett says he was directed to "go ahead," and have these blanks printed.   This is not corroborated by a single person present at this meeting, or at their informal discussion after the meeting had adjourned.   President Foster says that he asked Gen. Dudley to furnish the league with work, and Gen. Dudley replied that he would see that the blanks submitted were prepared and sent out.   Gen. Dudley, according to President Foster, further said that he had large quantities of literature at Washington, and would see that they were forwarded to the league.   Gen. Dudley says that the advisability and desirability of the use of these blanks were freely discussed, but that he desired no printing done for the league or himself, at that time, or any other time, by plaintiffs' firm, or any other firm, and that he gave no orders to do any printing.   One of the plaintiffs—Mr. Martin—testifies that he took all his orders from Mr. Daggett, whom he believed to be authorized by Gen. Dudley, and, in order to be certain that Mr. Daggett had the authority he claimed, he wanted to see something in writing from Gen. Dudley.   When thereupon Gen. Dudley wrote to President Foster that Ex-senator Daggett was authorized to represent him, and that Mr. Foster might consult with him, this letter, on being shown to Mr. Martin, was satisfactory to him.   Gen. Dudley, called on behalf of plaintiffs, denies that he conferred any authority whatever upon Mr. Daggett, and swears that the latter acted merely as a messenger between Mr. Foster and himself.   The executive committee held no meeting after July 12, 1888, and the subexecutive committee, to which the powers of the executive committee had been delegated, held but three meetings in 1888,—one in February, one in June, and one in September.   In my view of the case, it is unnecessary to discuss the question whether the constitution empowered any executive or subexecutive committee or campaign committee to do this work.   Suffice it

to say that none of these committees ever exercised or pretended to exercise such power. I am of the opinion that neither the campaign committee, nor any one else on behalf of the league, authorized Mr. Daggett to have the work done by plaintiffs; and, even assuming that some one or several of the members of the campaign committee did say that these blanks ought to be printed, it would be preposterous to claim that this authorized Mr. Daggett to expend about $25,-000 in the name of the league, substantially as he saw fit. It is therefore evident that there was no express authority from the defendant to do this work.

"In discussing the second point it is not necessary to argue the question whether or not President Foster did act towards third parties as one clothed with full authority to make any and all contracts on behalf of the defendant; nor is it necessary to argue the question whether the defendant, negligently or otherwise, allowed the president so to act. The undisputed testimony of one of the plaintiffs—Mr. Martin himself—is to the effect that he undertook this work upon the faith of Mr. Albert Daggett, as the authorized representative of Gen. Dudley, and that he relied upon Gen. Dudley, as the chairman of the campaign committee, as the treasurer of the national committee, and furthermore, as the representative, or, if I might use the term, as the 'paymaster,' of the Republican party. Therefore, from the plaintiffs' own testimony, it is very plain that they were not misled in any way by any appearance of power or authority on the part of the president of the league. In this connection I am not unmindful of the fact that all the literature alleged to have been printed by plaintiffs for defendant had at its head the name and symbol of the defendant, and that quantities of it were received and mailed from defendant's headquarters at No. 202 Fifth avenue, New York city. Yet, when we take into consideration that the league was merely to distribute literature furnished by the national committee; that the management of the league's affairs was in the hands of an executive committee; that this executive committee had legally or illegally delegated some of its powers to a subexecutive committee, and possibly also to a campaign committee; that these committees had no meetings after July, 1888, except the subexecutive committee, which met but once, (in September;) that, with the exception of President Foster and Gen. Dudley, there is no evidence that a single member of the executive, subexecutive, or campaign committee knew of plaintiffs' claim, or knew that the work was being done at No. 64 Broad street, or elsewhere, on behalf of the league; and that the president and the secretary of the league were the only officers or committeemen of the league, who, after August 1, 1890, performed any active duties at league headquarters,—it seems to me that the presumption of actual or constructive knowledge is overcome.

"A point was also made of the fact that the minutes of the subexecutive committee show that in February, 1888, $25,000 was appropriated for campaign work for the city of New York. It is claimed that this money was intended for such work as the plaintiffs did, and it is insinuated that this money could not have been raised by the league, except by just such work as that done by the plaintiffs. The evidence shows that the receipts of the league during 1888 were upwards of $20,000 outside of any income traceable to any work done by the plaintiffs. It is true that the popular subscription blanks printed by plaintiffs brought upwards of $8,000 into the hands of President Foster, but all of this, and more, too, was paid to plaintiffs. In a certain sense, this might have been justifiable, yet Mr. Foster had no authority so to do, and knew he had not, for he testified that he believed the Republican National Committee owed this bill. Finally, assuming that Mr. Daggett, or possibly President Foster, were defendant's agents, and unauthorizedly contracted with plaintiffs, yet there cannot be a ratification by the principal without full knowledge of all the material facts. There is no evidence that plaintiffs' claim was ever presented to the convention, the executive or subexecutive committee of defendant, which met after the work was begun and completed, and before suit was commenced; nor even that the delegates to the convention of these committees were aware of the existence of such a claim. For the reasons stated, I am forced to the conclusion that, whoever may owe the bill in suit, the defendant certainly does not, and I therefore believe the bill ought to be dismissed upon the merits, with costs. Judgment accordingly."

For former reports, see 10 N. Y. Supp. 129, and 13 N. Y. Supp. 602.

Argued before FREEDMAN, McADAM, and GILDERSLEEVE, JJ.

Nichols & Bacon, for appellants.

Blanchard, Gay & Phelps, for respondent.

PER CURIAM. The judgment should be affirmed, with costs, for the reasons set forth in the memorandum of decision filed by the referee.

---

### PEOPLE ex rel. LEWKOWITZ v. FITZGERALD, Register.

·(Superior Court of New York City, Special Term. January 9, 1893.)

MORTGAGE—SATISFACTION BY FOREIGN EXECUTOR—DUTY OF REGISTER.

A satisfaction of a mortgage executed by a foreign executor of the mortgagee must be accepted by a register of deeds in New York when no letters testamentary have been issued there; such executor being a personal representative of the testator, within the meaning of 4 Rev. St. (8th Ed.) pt. 2, § 28, c. 3, p. 2474. which provides that any recorded mortgage shall be discharged of record by the officer in whose custody·it shall be, on presentation to him of a certificate signed by the personal representatives of the mortgagee, and duly acknowledged, specifying that such mortgage has been satisfied.

At chambers. Application by Isidor Lewkowitz for a mandamus to compel Frank T. Fitzgerald, as register of the city of New York, to accept a satisfaction of a mortgage. Writ granted.

Isidor Lewkowitz and wife made a mortgage, dated December 6, 1887, on two pieces of property, known as "Nos. 272 and 290 Grand Street, New York City," to Joseph B. Hoyt, to secure the sum of $10,000. which mortgage was recorded in Liber 2241 of Mortgages, p. 70. Mr. Hoyt, who was a resident of the state of Connecticut, died in 1888, leaving a will by which he appointed Thomas G. Ritch and others his executors. In February, 1889, the mortgagor paid to Mr. Ritch, as ·executor, the mortgage, and took a satisfaction piece thereof. This satisfaction the register of the city of New York declined to receive, on the ground that an ·executor appointed by the probate court of another state could not satisfy a mortgage in this state, though there were tendered to him at the time authenticated ·copies of the certificate of issue of letters testamentary to the said Thomas G. Ritch, as such executor.

Dixon, Williams & Ashley, for relator.

William H. Clark, Corp. Counsel, for respondent.

DUGRO, J. This is an application for a mandamus compelling the register to receive, file, and record in his office a satisfaction of a mortgage. The mortgage was made by the relator to a person now deceased. The satisfaction piece was executed by one who had received letters testamentary and qualified as executor in Connecticut. It appears that no letters have been issued in this state. The question·is whether the register must accept the satisfaction piece of an executor, appointed in another state, if it appears that no letters have been issued in this state. I think he must. Under the circumstances, such an executor is a personal representative of the testator, within the meaning of the term as used in 4 Rev. St.[1] (8th Ed.) pt. 2, § 28, c. 3, p. 2474. There is no

---

[1] 4 Rev. St. (8th Ed.) pt. 2, § 28, c. 3, p. 2474, provides: "Any mortgage that 'has been registered or recorded, or that may hereafter be recorded, shall be dis-·charged, upon the record thereof, by the officer in whose custody it shall be, whenever there shall be presented to him a certificate signed by the mortgagee, his personal representatives or assigns, acknowledged or proved and certified as hereinbefore prescribed, to entitle conveyances to be recorded, specifying that ·such mortgage has been paid, or otherwise satisfied and discharged."